IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 15, 2025

## STATE OF TENNESSEE v. MICHAEL TAYLOR

**Appeal from the Criminal Court for Shelby County**
**No. 23-01585        Carlyn L. Addison, Judge**

_____

### No. W2025-00156-CCA-R3-CD

_____

The Defendant, Michael Taylor, entered a guilty plea to arson pursuant to <u>North Carolina v. Alford</u>, 400 U.S. 25 (1970), for which he received an agreed upon four-year sentence with the manner of service to be determined by the trial court. Following a hearing, the trial court imposed a sentence of one year in confinement followed by three years' supervised probation. In this appeal, the Defendant contends that the trial court erred in denying full probation.[1] Upon review, we affirm the judgment of the trial court.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN,.J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J., and J. ROSS DYER, J., joined.

Barry W. Kuhn, Assistant Shelby County Public Defender (on appeal); Phyllis Aluko, Chief Public Defender; and Michelle L. Whitman, Shelby County Public Defender (at trial), for the appellant, Michael Taylor.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin L. Barker, Assistant Attorney General; Steve Mulroy, District Attorney General; and Alyssa Hennig, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

On January 8, 2025, the trial court conducted a hearing on the Defendant's guilty plea. At the top of the hearing, the State provided the following factual basis in support of the guilty plea:

---

[1] The Defendant also petitioned the trial court for judicial diversion and was denied. He does not challenge the denial of judicial diversion in this appeal; accordingly, it is waived.

This is State of Tennessee versus Michael Taylor, Indictment 23-01585. [The Defendant] is going to be pleading guilty on count one to arson. That is a C felony. State's recommending a sentence of four years as a range one offender at 30 percent. He will be petitioning for diversion or suspended sentence, but the State is not in agreement with that.

Had this case gone to trial, the State's proof would [have] shown that on November 20, 2022, at approximately 1900 hours, [Bartlett police officers] were dispatched to 4520 Guinevere Lane on a mental consumer call. On arrival, Officer Gomez made contact with the suspect who is the [D]efendant in our case. . . and he was in the entry area of the house. Officer Gomez quickly pulled the suspect out of the house doing—due to it being fully engulfed in flames.

Officers were able to make contact with the suspect's estranged wife who is the victim in this case, Ms. Bessie Matthews, who was on the scene. Ms. Matthews stated that she called because a friend of hers had seen a post on Facebook from the suspect threatening to commit suicide by burning the house he and his wife shared.

At the time of the report, Ms. Matthews was attempting to get the Facebook information and possible screenshots of the suspect's comments. Ms. Matthews stated that she and the suspect got married on September 11, 2022. Ms. Matthews stated after they got married their relationship became physically and mentally abusive and he was stealing from her. She stated that she left the suspect in October and has not returned until tonight. Ms. Matthews stated that the suspect has been known to use marijuana, pain pills, and cocaine.

Bartlett Fire Department engines two, three, and four made the scene and quickly started to put the fire out. Fire fighters were able to determine that the suspect had poured gasoline all over the house which made it hard for them to extinguish the fire. Bartlett Fire Department fire marshal made the scene and began his investigation which ultimately determined that this was in fact an arson. Suspect was transported to Saint Francis in Bartlett. Photos of scene were taken.

All of those events occurred here in Shelby County. We ask – I guess this is also an Alford plea. So, that would have been the State's proof had this case gone to trial.

The trial court advised the Defendant of his rights pursuant to the guilty plea and the rights the Defendant would be waiving by entering the guilty plea. The court noted

that the Defendant was entering his guilty plea pursuant to <u>North Carolina v. Alford</u>[2] and asked the Defendant if he had heard the facts supporting the guilty plea announced by the State. In response, the Defendant stated, "I heard that, but it wasn't true." He was not asked, nor did he state which aspects of the factual basis were untrue. The Defendant told the court that he was "denying guilt," but he believed it was in his "best interest" to enter the guilty plea. The court determined that the Defendant had entered a knowing and voluntary guilty plea and accepted the terms of the negotiated plea agreement announced by the State.

Immediately following acceptance of the guilty plea, the trial court conducted a sentencing hearing. The Defendant testified that he married the victim on September 11, 2022, sold his home, and moved into the victim's home. The victim owned her home, and the Defendant's name was not on the "title." Within two months of getting married, the Defendant and the victim became estranged. At some point, the victim moved out of the house and filed for a divorce. The Defendant claimed that he too had filed for divorce and was preparing to move out around the time of the fire. He was the only person living at the victim's home at the time of the fire.

The Defendant did not remember what happened on the night of the fire, but he claimed he did not pour gasoline around the house. He recalled that on the night of the fire, he was talking to the victim on the phone when he smelled smoke and told her to call the fire department. He then grabbed a fire extinguisher, attempted to extinguish the fire but passed out due to the smoke, and was pulled out of the house by an officer. He woke up two days later in the hospital. The Defendant claimed that the Bartlett Fire Department (BFD) was unsure of what caused the fire because "they poured so much water on the house" and the fire dogs were unable to come to a conclusion. The Defendant acknowledged the "hotspots" noted in the arson report by the victim's insurance company and the insurance companies' conclusion that the fire was the result of arson. He also acknowledged that BFD adopted the report and conclusion of the insurance company.

The Defendant denied that he was suicidal; however, he acknowledged that he spent eight days in the hospital and was under a suicide watch. Upon release from the hospital, the Defendant was admitted to Lakeside and was diagnosed with depression. He was evaluated by court officials and found competent for the instant proceedings. He stated that he had "moved on" and was excited about his life. Upon release from Lakeside, the

---

[2] Although uncommon, criminal defendants also may plead guilty while maintaining that they did not commit the crime charged. <u>Frazier v. State</u>, 495 S.W.3d 246, 250 n.1 (Tenn. 2016). Such pleas are often referred to as "Alford pleas" based on the United States Supreme Court case, <u>North Carolina v. Alford</u>, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970). In <u>Alford</u>, our nation's high court held that a defendant who professed his innocence could nonetheless enter a constitutionally valid guilty plea when the defendant "intelligently concludes that his interests require entry of a guilty plea." <u>Id.</u> (internal citation omitted).

Defendant was homeless and went to Restoration House, which was part of a faith-based organization for temporary housing. The Defendant lived at Restoration House for two years, participated in their counseling sessions, and became an intake personnel supervisor. At the time of the hearing, the Defendant was employed with Restoration House and taught alcohol and drug classes. Representatives from Restoration House had planned to attend the sentencing hearing in support of the Defendant; however, he said they were unable to do so because the hearing had been reset so many times.

The Defendant eventually moved to a permanent residence and had been living there for almost a year. The Defendant received social security disability and medical retirement from Nike. The Defendant explained that he had glaucoma in one eye, causing partial blindness, high blood pressure, and congestive heart failure. He also stated that he was previously diagnosed with depression, but that he felt fine at the time of the hearing. The Defendant provided the court with documentation in support of his medical issues.

Defense counsel referenced the presentence report, and the Defendant acknowledged that he had a "criminal background," including several charges for driving while his license had been suspended. Notwithstanding the instant arson conviction, the last time the Defendant was charged with a criminal offense was in 2018. The Defendant explained that the charge was dismissed after he told the judge he had been unable to pay for his license due to child support issues. He said he had completed his child support obligations. The Defendant agreed that he had been charged with multiple driving offenses, and, in 2006, he was convicted of a driving related offense. When asked about misdemeanor assault charges in 2000, the Defendant responded that he did not recall any of it. He also agreed that he had pled guilty to disorderly conduct in 2005 and assault in 1989.

The Defendant explained he had four adult children, and a brother and a sister. Asked why he should receive judicial diversion or probation, the Defendant replied, "I am really a good person. I haven't been in a whole lot of trouble other than my driving record. My medical problems are really . . . extensive. And I just don't recall everything." He wanted to put the case behind him. Asked if there was anything else he wanted to tell the court, the Defendant said the summer before the fire a technician told him that "there was a lockout tag off of the heater" which caused it to be flammable. He advised the court that when he told the victim about it, she said it was "'probably something her ex-husband had done." The Defendant vehemently denied pouring gas all over the victim's house. At the time of the hearing, the Defendant and the victim were divorced with no children.

On cross-examination, the Defendant said he was in the garage when the fire started. He did not know why he asked the victim to call 911 instead of calling 911 himself. He denied telling the victim she left him with no other choice, and he denied creating Facebook

posts concerning the fire. He denied initially telling BFD that he knocked over a bottle of alcohol and then lit a lighter and his hand caught on fire in a back bedroom closet. He denied various statements he made to investigators concerning a gas can inside the home. He took responsibility for the fire because he was the only one in the house, not because he set the house on fire. The Defendant was asked about the various arrests in the presentence report, but he could not remember the specifics. He was asked about his arrest for assault in 2000 and who it involved, to which he responded, "I think my daughter['s] mom and I had an altercation, but that was it. I don't remember being charged or — I don't remember too much about that one." When asked about an assault and battery in 1989, the Defendant stated that his girlfriend at the time hit him, and they began "tussling." The Defendant stated that the disorderly conduct arrest in 2005 resulted from him pushing his then-girlfriend out of the way when he was trying to leave. Asked if he had any problems with the victim, the Defendant said they "just couldn't get along." He denied any physical altercations with her and claimed the victim "had the reigns" because "her money was her power."

The Defendant acknowledged that the arson report concluded that the point of origin of the fire was from the master bedroom from a lighter and some flammable fluid. He claimed to have been using marijuana consistently in 2022; however, he could not explain why he told the presentence report officer he did not have any problems with drugs.

On redirect examination, the Defendant repeated that his prior criminal history occurred over twenty years ago, and he could not remember many details. The defense entered the presentence report as an exhibit and concluded their proof.

The report reflected that the Defendant was seventy-one years old[3] and had been convicted of sixteen driving related offenses. In addition, the Defendant had been convicted of assault and battery, disorderly conduct, non-payment of fines, violation of Tennessee's Financial Responsibility Law of 1977, and twice for failure to appear (misdemeanor).

The report also included arrests from Shelby County, Jefferson Parish, St. Charles Parish, and Orleans Parish. In Shelby County, the Defendant was arrested seven times for driving on a revoked license and once for disturbing the peace. In Jefferson Parish, the Defendant was arrested for simple assault, marijuana possession, driving on a revoked license, and other traffic related offenses. In Charles Parish, the Defendant was arrested

---

[3] We note a discrepancy between the Defendant's age as reflected in the record. At the sentencing hearing defense counsel stated that the Defendant was sixty-one years old, while the presentence report indicates that the Defendant is seventy-one years old. This inconsistency does not affect our analysis of the issue on appeal.

for simple assault, marijuana possession, and other traffic related offenses. In Orleans Parish, the Defendant was arrested for driving with a revoked license and marijuana possession.

Bessie Matthews, the victim in this case, testified at the sentencing hearing that she met the Defendant in December of 2021, and they got married in September of 2022. After they were married, the Defendant became violent, stole from her bank account, and pawned things from her home, causing her to move out and file for divorce. Matthews stated that she purchased her home, everything she owned was in the house on the night of the fire, and that she and the Defendant were scheduled to appear in court the following day for an eviction proceeding. She said that on the evening of the fire, her friend sent her screenshots of the Defendant's Facebook posts. While she was reading the posts, the Defendant called her. During the call, the Defendant told her that she "left him no choice," he "had nowhere else to go," and he "rant[ed] about [how] his children didn't love him and [Matthews] never loved him." At the end of the conversation, he said, "Oh, by the way, I've set your house on fire." She said the Defendant never told her to call 911 because he smelled smoke in her home.

Matthews stated that the aftermath of the fire significantly impacted her life, prompting her to seek counseling and therapy. She also said that her fear of the Defendant prevented her from going out alone and traveling after dark. Her fear of him was so severe that she needed to be escorted to her job, and a picture of the Defendant was posted to prevent him from entering the premises. Matthews confirmed that she lost all her possessions other than a bag of clothes she had taken with her when she moved out and her vehicle. Her home was a "total loss," and she will be "forever traumatized" by the actions of the Defendant. She said he tried to contact her via Facebook Messenger within the last six months, but she did not respond.

Asked her position on sentencing, Matthews stated, "When persons have a violent nature and they're not held accountable and they don't accept responsibility for it, that pattern continues and they victimize others. And that's why I'm so adamant about appearing because I don't want anyone else to have to endure and go through the hell that I've been through." She urged the court to sentence the Defendant to confinement.

On cross-examination, she acknowledged that the Defendant may have stolen some things from her, but she did not report it. She said the only charges she filed against him were pertaining to arson and a restraining order. She agreed that he had not come to her place of employment. She agreed she did not know if the Facebook Messenger message was, in fact, from the Defendant, and she did not open it. She said she had previously made domestic violence calls against the Defendant. She agreed there was a concern the Defendant would engage in self-harm or suicide on the night of the fire. She agreed that

she had insurance for her home and was required to pay a $1,000 deductible. She did not rebuild her home and chose to purchase another home.

In sentencing the Defendant, the trial court highlighted the "severe, serious traumatic experience" that Matthews went through, stating, "I'm not of the opinion that we minimize people's property being damaged because it affects them on a personal level. . . . She had to start over." The trial court discredited the Defendant's testimony, found that he was "not honest," and that he was without remorse for his conduct. The trial court also expressed concern with the Defendant's "forty years' worth of contact with law enforcement in multiple jurisdictions," finding that the Defendant "doesn't want to comply with conduct that's just basic for a citizen to walk amongst us free." The court continued, "[a]nd he's certainly not going to conform his behavior, his assaultive behavior, repeated patterns of intimate partner violence." The court acknowledged the Defendant's low risk level; however, the court was concerned that the Defendant would be released without adequate supervision. Accordingly, the trial court imposed a sentence of three years of supervised probation following service of one year in confinement. The Defendant timely appealed.

## ANALYSIS

On appeal, the sole issue presented for our review is whether the trial court erred in denying the Defendant probation and imposing a sentence of split confinement. The Defendant argues the trial court erred by imposing a sentence of split confinement rather than granting full probation, particularly given the fact that this was his first felony conviction. In response, the State contends that the trial court acted within its discretion in determining split confinement based on the Defendant's criminal history and the seriousness of the offense. Additionally, the State contends that the trial court made adequate findings to support its ruling and that, even if the trial court's articulation of those findings were not explicitly stated, the record as a whole supports the split-confinement sentence. We agree with the State.

"[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including questions related to probation or any other alternative sentence." State v. Caudle, 388 S.W.3d 273, 278–79 (Tenn. 2012) (citing State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012)). Any sentence that does not involve complete confinement is an alternative sentence. See generally State v. Fields, 40 S.W.3d 435 (Tenn. 2001). Sentences of full probation and full community corrections are alternative sentences that do not involve any confinement. A sentence of split confinement in which a defendant is required "to serve a portion of the sentence in continuous confinement for up to one year in the local jail or workhouse" followed with probation pursuant to Tennessee Code

Annotated section 40-35-306(a) or followed with community corrections pursuant to Tennessee Code Annotated section 40-35-302(b) is an alternative sentence involving confinement. Tenn. Code Ann. § 40-35-306 (2016); see also Ray v. Madison Cnty., Tennessee, 536 S.W.3d 824, 833 (stating that a split confinement sentence is an alternative sentencing option that combines incarceration and rehabilitation). Before a trial court sentences a defendant to a sentence involving confinement, including split confinement, the trial court should determine whether an eligible defendant is a suitable candidate for an alternative sentence that does not involve confinement—full probation or full community corrections. See State v. Harbison, No. M2015-01059-CCA-R3-CD, 2016 WL 613907, at *6 (Tenn. Crim. App. Feb. 12, 2016) (holding that the trial court erred by denying full probation and imposing a sentence of probation following six months in incarceration because there was "no substantial evidence in the record which would support the denial of probation"), no perm. app. filed. We note that the trial court's determination of whether the defendant is entitled to an alternative sentence and whether the defendant is a suitable candidate for full probation are different inquiries with different burdens of proof. State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). The defendant has the burden of establishing suitability for full probation, even if the defendant is considered a favorable candidate for alternative sentencing. See id. (citing T.C.A. § 40-35-303(b)).

Generally, a defendant is eligible for probation if the actual sentence imposed upon the defendant is ten years or less and the offense for which the defendant is sentenced is not specifically excluded by statute. Tenn. Code Ann. § 40-35-303(a). When determining whether a defendant is suitable for probation, a trial court can consider: (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; and (6) the deterrence value to the defendant and others. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998). The principles of sentencing also require the sentence to be "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4). In addition, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed[,]" and "[t]he length of a term of probation may reflect the length of a treatment or rehabilitation program in which participation is a condition of the sentence[.]" Id. § 40-35-103(5). Moreover, our supreme court has held that truthfulness is a factor which the court may consider in deciding whether to grant or deny probation. State v. Bunch, 646 S.W.2d 158, 160 (Tenn. 1983) (citing State v. Poe, 614 S.W.2d 403, 404 (Tenn. Crim. App. 1981)).

A defendant who is convicted as an especially mitigated or standard offender of a Class C, D, or E felony is considered a favorable candidate for probation in the absence of evidence to the contrary. Tenn. Code Ann. § 40-35-102(6)(A). Here, the Defendant

pleaded guilty to a Class C felony as a standard offender. Accordingly, he is considered a favorable candidate for alternative sentencing. However, a trial court "shall consider, but is not bound by, the advisory sentencing guideline" in section 40-35-102(6)(A). Tenn. Code Ann. § 40-35102(6)(D). A trial court should consider the following when determining whether there is "evidence to the contrary" indicating that an individual should not receive alternative sentencing:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

Id. § 40-35-103(1)(A)-(C); see State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

Additionally, the trial court should impose a sentence which is consistent with the principles of sentencing and the least severe measure necessary to achieve the purpose for which the sentence is imposed. Tenn. Code Ann. § 40-35-102 (2), (4).

Here, the Defendant entered a guilty plea to arson for which he received an agreed upon four-year sentence with the manner of service to be determined by the trial court. Following a hearing, the trial court imposed a sentence of split confinement, with the first year to be served in confinement followed by three years' supervised probation. The trial court denied the Defendant full probation after determining that full probation would unduly minimize the seriousness of the offense, and that incarceration was more appropriate based on the Defendant's previous and continued "willful criminal behavior." Based on our review of the record, we conclude that the trial court did not abuse its discretion in imposing a sentence of split confinement.

Although the Defendant correctly observes that the trial court did not explicitly reference the amenability to correction factor in its sentencing determination, the record clearly demonstrates that the court considered the Defendant's lack of remorse and refusal to accept responsibility as indicative of a diminished amenability to correction. At the sentencing hearing, during both direct and cross-examination, the Defendant was questioned regarding his acceptance of responsibility for causing the fire. He responded affirmatively, but solely because "[he] was the only one in the home" at the time.

The trial court also found the Defendant lacked candor and was unwilling to "comply with conduct that's just basic for a citizen to walk amongst us free," which also

weighed against the Defendant's amenability for correction. See State v. Dowdy, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994) (holding consideration of defendant's candor while testifying was probative of prospects for rehabilitation); State v. Garris, No. M2012-01263-CCA-R3CD, 2013 WL 838673 (Tenn. Crim. App. Mar. 6, 2013) ("[T]he trial court denied judicial diversion largely based upon the defendant's lack of candor and failure to accept responsibility, which are both acceptable grounds for the denial of both judicial diversion and probation.").

The record also clearly shows that the trial court considered the nature and circumstances of the offense in denying probation. The trial court found the extent of the victim's financial and emotional losses in this case reflects the seriousness of the offense. See State v. Zeolia, 928 S.W.2d 457, 462 (Tenn. Crim. App. 1996) (noting that the victims' financial losses is a factor directly relevant to the seriousness of the offense in determining whether confinement is appropriate in a given case). The trial court emphasized that the seriousness should not be minimized as "[p]roperty crimes are still attached to people," and the damage to someone's property "affects them on a personal level." Additionally, the court noted that the victim "will never be made fully whole based on what she lost" because "an entire house was burned down, an entire house full of contents, memories, valuables that was not restored."

Lastly, the trial court considered the Defendant's criminal history, noting that while the Defendant's last offense was twenty years ago, the Defendant has had forty years' worth of continued contact with law enforcement. Although this case was the Defendant's first felony, the trial court properly relied on the Defendant's criminal history as set out in the presentence report. See State v. Stubblefield, 953 S.W.2d 223, 225 (Tenn. Crim. App. 1997) ("[C]riminal history, through conduct or by convictions, may enhance a sentence or result in imposition of a sentence to confinement."). According to the presentence report, the Defendant has had a litany of offenses for driving without a proper license, spanning from 1989 to 2018. The Defendant also had several assault offenses in 1989, 1999, and 2000, each arising from disputes with former girlfriends. The Defendant's most recent non-traffic was for disorderly conduct in 2005, which also stemmed from an argument with a former girlfriend. The trial court found that the Defendant displayed "continued willful criminal behavior" in knowingly driving without a valid driver's license and based on the multiple occasions of intimate partner violence.

Although the Defendant contends that the trial court provided inadequate support for its imposition of split confinement, the record as a whole reflects that the trial court fully considered an alternative sentence in light of the circumstances of the Defendant's case. We acknowledge and agree that the trial court failed to explicitly articulate its consideration of the required factors in denying full probation. However, the trial court properly considered the Defendant's criminal conduct and the seriousness of the offense,

both of which support the denial of alternative sentencing.  <u>See</u> Tenn. Code Ann. §§ 40-35-103(1)(A), (B).  Accordingly, we are unable to conclude that the trial court improperly imposed a sentence of split confinement.

**<u>CONCLUSION</u>**

Upon review, we affirm the judgment of the trial court.

s/ Camille R. McMullen
CAMILLE R. MCMULLEN, PRESIDING JUDGE

- 11 -